UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

      PYRAMID AUTO GROUP, INC.         CASE NO. 04-69021

                Debtor       Chapter 11

--------------------------------------------------------
APPEARANCES:

HARRIS LAW OFFICE, PLLC       STEWART L. WEISMAN, ESQ.
Attorneys for Debtor           Of Counsel
4199 East Genesee Street
Syracuse, NY  13214

DOONAN, GRAVES & LONGORIA, LLC     RENEAU J. LONGORIA, ESQ.
Attorneys for States Resources Corporation   Of Counsel
100 Cummings Center Suite 213C
Beverly, MA 01915

GUY A. VAN BAALEN, ESQ.
Assistant U.S. Trustee
10 Broad Street
Utica, New York  13501


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge


### MEMORANDUM-DECISION, FINDINGS OF FACT,
### CONCLUSIONS OF LAW AND ORDER


      Under consideration by the Court is a motion filed by Pyramid Auto Group, Inc.

("Pyramid" or the "Debtor"), the debtor in possession, on January 5, 2005, seeking an order, that

(i) authorizes the use of cash collateral; (ii) compels a state court appointed receiver to account

for all money received and disbursed by the receiver with respect to the property of the estate;

(iii) removes the receiver from custody of property of the estate; and (iv) compels the receiver

to turn over all property of the estate, including but not limited to all cash received, keys, and

records of account. Pyramid files this motion pursuant to Rule 4001 of the Federal Rules of

Bankruptcy Procedure ("Fed.R.Bankr.P.") and section 363 of the Bankruptcy Code, 11 U.S.C.

§ § 101-1330 ("Code").[1] States Resources Corporation ("States") opposed the Motion and filed

its own Motion on January 13, 2005, for (i) a protective order concerning the properties under

the receivership and (ii) for relief from the automatic stay, pursuant to Code § 362(d)(2). On

January 19, 2005, the United States Trustee ("U.S. Trustee") filed an objection to the Debtor's

Motion.

The Court heard oral argument on the motion at its regular motion term in Utica, New

York on January 25, 2005. The Court then scheduled the contested matter for an evidentiary

hearing commencing on March 7, 2005, and continuing on April 4, 2005. Upon conclusion of the

evidentiary hearing, the Court provided the parties an opportunity to file memoranda of law by

May 6, 2005. The contested matter was submitted for decision after that date.

## JURISDICTION

The Court has core jurisdiction over the parties and subject matter of this contested matter

pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1), (b)(2)(A), (B), and (O).

## FACTS

---

[1]Although the Debtor does not cite to Code § 543 in its initial Motion, the Debtor seeks
to remove the receiver pursuant to that Code section.

3

The Debtor is engaged in the business of selling used cars and operating and maintaining a number of income producing rental properties located in Auburn, New York. *See* Transcript of April 4th Hearing ("April 4th Tr.") at 8. David G. Heffernan ("Heffernan") is the sole shareholder, director, and officer of the Debtor. *Id.*

On December 16, 2004, the New York State Supreme Court for Cayuga County issued an amended judgement of foreclosure and sale against, *inter alia*, the Debtor, Heffernan, and Promiseland Ventures Inc. ("Promiseland").[2] *States Ex. MMM*. The state court awarded States $286,948.32 in principal, with interest from the date of the referee's report, which was May 1, 2004. *Id.* The state court also awarded attorney fees and costs of $20,149.50 and disbursements of $7,553.28. *Id.* The total owed to States as of May 1, 2004, was $314,651.10. *Id.* Neither party disputes this amount is owed. *See* Transcript of March 7th Hearing ("March 7th Tr.") at 10.

The state court appointed John Bouck, ("Bouck" or the "Receiver") receiver of the Properties on October 1, 2003. *States Ex. A.* The state court order authorized the Receiver to operate and manage a number of the rental properties, collect rents, and to take all legal proceedings necessary to protect them. *Id.* The order also enjoined Heffernan, Promiseland, and the Debtor from collecting rents from the properties and from interfering with them. *Id.* The state court directed Heffernan, Promiseland, and the Debtor to deliver to the Receiver the security deposits from the rental properties and all existing leases and rent schedules. *Id.* Out of the money received from the rents, the state court ordered that the Receiver should first deduct monies that are absolutely necessary to keep the properties in repair, then to pay insurance premiums, fuel, taxes, assessments, and water rates, and retain the balance, if any, until further order of the state

---

[2]Heffernan is the president of Promiseland.

4

court. *Id*. The Receiver, thereafter, took immediate possession of the rental properties and collected the rents from the tenants occupying them. *See States Exs. RR*, *R2*.

The Debtor filed its Chapter 11 petition on December 29, 2004. The total value of the Properties, according to Schedule B of the Debtor's bankruptcy petition, is $200,100. States asserts that it has a first mortgage on a number of rental properties and that the mortgages also secure rents derived from them. After the Debtor filed its petition, States apparently notified the Debtor that it did not consent to the Debtor's use of any cash collateral in the form of rents derived from the Properties. *See* Debtor's Mot. to use Cash Collateral and to Remove the Receiver at 2.

At the evidentiary hearing, the Receiver and the Debtor stipulated that the Debtor owns six properties (the "Properties"), against which States holds a promissory note that is secured by a single, consolidated mortgage on those Properties. *See* March 7th Tr. at 9. Heffernan testified that the Debtor owns "some twenty-five separate properties." *See* April 4th Tr. at 8. Seventeen of the properties are unencumbered by liens, six properties are encumbered by States's lien, and there are two remaining properties, which are encumbered by mortgage liens held by third parties. *Id*. at 118.  The Receiver and the Debtor also testified regarding the conditions of the Properties. The salient points are as follows:

71 Seymour Street Auburn, New York:  This is a two unit apartment house.  *Id*. at 11. The Debtor asserted that prior to the October 2003 turnover, both units were rented, netting $1,150 per month in rent.  *Id*. at 12.  However, in a November 5 letter to the Receiver from Heffernan's real estate attorney, Carl DePalma, Esq. ("DePalma"), DePalma indicated that one of the tenants should be evicted and the other tenant had moved out, leaving the apartment

5

vacant. *See* States Ex. E.  DePalma wrote the letter on behalf of Heffernan because Heffernan

believed that it would assist the Receiver in administering the Properties. *Id*.  The Receiver

testified that he was only able to gain access to one of the apartments on October 3, 2003, and

that it was in poor condition, though the "mechanicals" appeared to be working.  *See* March 7th

Tr. at 14; States Ex. B.  According to the testimony of Brian Hicks ("Hicks"), Senior Code

Enforcement Officer for the City of Auburn, the City condemned both units on June 25, 2004,

for lack of utilities and broken windows.  *See* March 7th Tr. at 118. Currently, the property is

vacant.  *See* April 4th Tr. at 12.  The Debtor estimated the cost to repair the property at $3,000,

while the Receiver estimated that the cost to make the property habitable would be $3,000 to

$5,000.  *Id*. at 15, 145.

73 Seymour Street Auburn, New York:  This is a five unit apartment house.  *Id*. at 22.

The Debtor asserted that prior to the October 2003 turnover, two units were rented, netting

approximately $2,000 per month in rent, although one tenant was behind in payments.  *Id*. at 23.

However, in DePalma's November 5 letter to the Receiver, DePalma recommended to the

Receiver that one tenant should be evicted.  *See* States Ex. E.  The Receiver indicated that he

inspected the house on October 3, 2003, and found it in very poor condition.  *See* March 7th Tr.

at 14; States Ex. B.  The tenants moved out after the Receiver took over the property's

management.  *See* April 4th Tr. at 24. On December 22, 2004, the pipes in the house burst.  *See*

March 7th Tr. at 28.  The Receiver testified that there is water damage throughout the house, and

there is mold in the walls.  *See* April 4th Tr. at 24. The Receiver filed an insurance claim and

received over $8,000 from the insurer, which he said he would use to renovate the apartments.

*See* March 7th Tr. at 28; April 4th Tr. at 157.  The City of Auburn condemned the house on

December 27, 2004 for no water and unsanitary conditions.  *See* March 7th Tr. at  119.  The

Debtor testified that a $400 steel door was replaced with a hollow core door worth maybe $89.

*See* April 4th Tr. at 23-24.  The Receiver disputed that testimony, asserting that it was a beat up

dented old door that could not be locked.  *Id*. at 149.  He said it was replaced with a door worth

over $200.  *Id.*  According to the Debtor's testimony, coin operated laundry equipment was

removed from the basement of the property during the receivership.  *Id*. at 22.  The Receiver

stated that it would cost $7,800 to make the property habitable. *Id*. at 143.

 1-3 Perrine Street Auburn, New York: This is a three unit apartment house.  *Id*. at 18.

The Debtor testified that prior to the October 2003 turnover all three units were rented, netting

approximately $1,150 per month in rent.  *Id*.  However, one tenant was behind in rent.  *See* States

Ex. E.  In DePalma's November 5th letter, he acknowledged that there were several violations

of the Housing Code for the City of Auburn ("Housing Code"), that were scheduled for review

with the Auburn City Code Enforcement Office on November 20, 2003.  *Id*. The Receiver stated

that he inspected the property on October 3, 2003 and he found that the tenants were unhappy and

the property was in poor condition.  *See* March 7th Tr. at 14; States Ex. B.  In December 2003,

the pipes in the house burst.  *See* April 4th Tr. at 19.  The City of Auburn condemned the

property on December 5, 2003, because of no water supply and unsanitary conditions.  *See* States

Ex. F. Since then, the tenants moved out, and the property remains vacant.  *See* April 4th Tr. at

20.  The Debtor asserted that there is water damage and mold in the building.  *Id*. at 19.   The

Receiver also testified that he was not able to return any security deposits when the tenants

moved out because he did not know if the Debtor maintained an interest bearing account for

security deposits.  See March 7 Tr. at 20.  When tenants "stormed" into his office demanding

their deposits, the Receiver said he told them to talk to Heffernan.  *See* April 4th Tr. at 153. The

Debtor estimated that it would cost at least $5,000 to repair the premises.  *Id*. at 19.

13 Wall Street Auburn, New York:  This appears to be a two unit apartment house.[3] The

Debtor asserted that prior to the October 2003 turnover, both units were rented, netting $825 per

month in rent, though one tenant had not paid the rent in months. *Id*. at 21;  *See* States Ex. E.

DePalma's November 5th letter recommended that the Receiver should immediately evict the

tenant.  *See* States Ex. E.  The Receiver contended that he inspected the house on October 3,

2003, and found it in poor condition, though the "mechanicals were functioning."  *See* March 7th

Tr. at 14;  *See*  States Ex. B.  On January 19, 2005, the City of Auburn Housing Code

Enforcement Office mailed a letter to the Debtor informing the Debtor that there was improperly

disposed trash and debris around the property, which must be discarded properly.  *See* Debtor's

Ex. 17.  As of February of 2005, the Receiver collected $850 in rents for both apartment units.

*See* States Ex. AAA2.

6 Washington Street Auburn, New York:  This is a three unit apartment house.  *See* April

4th Tr. at 16.  The Debtor asserted that prior to the October 2003 turnover, two units were rented,

netting $1,200 per month in rent. *Id*. at 16. In DePalma's November 5th letter, DePalma

acknowledged that there was a Housing Code violation hearing scheduled for November 14,

2003.  *See* States Ex. E.  The Receiver testified that this house was also in poor condition when

he inspected the property on October 3, 2003.  *See* States Ex. B.  After the turnover, two of the

---

[3]Neither Heffernan nor the Receiver stated how many apartments are in 13 Wall Street, but it appears from their testimony and the Debtor's Post-Hearing Memorandum to Remove the Receiver from Property of the Estate that there are two units. *See* Debtor's Post-Hearing Mem. at 5.

three units were empty.  *See* April 4th Tr. at 16.  A fire occurred at the house on March 29, 2005.

*Id.* at134; *See*  States Ex. NNN.  According to the Auburn Fire Department report, the damage

to the property is $43,400.  *See* States Ex. NNN.  The Receiver filed a notice of claim with the

insurer.  He did not file for a specific amount because he did not know what the total damages

will be.  *See* April 4th Tr. at 158.  The Receiver believes that the property is insured  for $70,000.

*Id.* The Receiver stated that he thought the house will have to be demolished.  *Id.*  Presently, there

are no tenants in the house.  *Id.* at 151.

56 Chapman Street Auburn New York:  This is a three unit apartment house.  *Id.* at 147.

The Debtor asserted that prior to the October 2003 turnover, three units were rented, netting

approximately $1,375 per month in rent.  *Id.* at 13. DePalma's November 5th letter recommended

the eviction of one of the tenants.  *See* States Ex. E.  The Receiver inspected the house on

October 3, 2003, and found it in better condition than the other properties, but it still needed

extensive repairs.  *See*  March 7th Tr. at 15; States Ex. B.  Since the turnover, a former tenant

apparently smashed the tile floor in the kitchen of one of the apartments, and a large section of

siding blew off the house within the last year.  *See* April 4th Tr. at 14-15. One bathroom has

water damage. *Id.* at 14.  The Receiver has not repaired the house.  *Id.* at 15.  Hicks testified that

the City of Auburn has three open files on the property for Housing Code violations since

February of 2004. *See* March 7th Tr. at.110.  Hicks said that apartment 1 was condemned on

February 13, 2004, because the apartment had no smoke detector, a leak in the roof, and "some

electrical violations." *Id.*  The other two open files on the property consists of a violation

involving an unregistered vehicle and numerous violations on apartment 1, such as installing

corner molding on each apartment wall and installing proper floor heat register grades.  *Id.* at

112; See Debtor's Ex. 20.  Both Heffernan and the Receiver agreed that repairs would cost $5,000.  *See* April 4th Tr. at 15, 147. In February of 2005, The Receiver collected $400 in rent for one apartment unit in the building.  *See* States Ex. AAA.

On the date of transfer to the Receiver, it appears that eleven of the eighteen available rental units located in the Properties were rented, although the tenants in five of the six units needed to be evicted.  *See* Heffernan Aff.; States Ex. E.  The Receiver testified that there are four units currently being rented and that there were five units rented before the fire at 6 Washington Street.  *See* March 7th Tr. at 96.  The Receiver pointed out that at the time he took over the Properties, they were uninsured.  The Receiver obtained insurance, but because the rents collected from the Properties were insufficient to pay the premium, he requested that States pay the premium, which it is doing.  *Id*. at 23.  There was a lapse in the insurance, however, from approximately January 15, 2005 to March 7, 2005 when the Receiver's insurance company (Aversant Insurance Agency) cancelled its insurance because of the condition of the Properties. *Id*. at 23, 64.  The Receiver asserted that it took him about a month and a half to reinsure the Properties. *Id*. at 64.  The rents collected have not been sufficient to prevent the Housing Code violations or to pay taxes and insurance, according to the Receiver.  *Id*.  The Debtor asserted that after the turnover, major appliances, such as stoves, refrigerators, and coin-operated washers and dryers, went missing.  *See* April 4th *Tr.* at 22.  However, the Receiver claimed that the Debtor never provided him with a list of the appliances owned by the Debtor and he assumed that if tenants moved out and took appliances with them, those appliances were theirs and not the Debtor's.  *See* March 7th Tr. at 48.  The Receiver also stated that at the time of his appointment, he asked the Debtor's attorney to provide a list of the names of all tenants, but that was not

provided.  *Id*. at 13.  The Receiver testified that he is simply trying to maintain the apartments so that they do not deteriorate further.  *Id*. at 15.  He said that he focused on problems that were hazardous to the properties and did not focus on Housing Code violations that would make the real property marketable.  *Id*. at 88.  He also claimed that the Properties were in deplorable condition at the time he gained custody over them.  *See* Bouck Aff. at 1.  He said that he has worked actively with the City of Auburn to keep the remaining apartments from violating its Housing Code.  *Id*. at 2.  He claimed that he has maintained the Properties as well as possible, but because of the poor condition they were in when he received them, the apartments are well below the normal rental standards in the community.  *Id*. at 2;  *See* April 4th Tr. at 63.  The Receiver continued by asserting that it has been difficult to obtain tenants without considerably upgrading the apartments, which was impossible to do because of the lack of rental income available.  *See* March 7 Tr. at 57.

In November and December of 2004, the Receiver collected $1,880 in rents for each month.  *See* States Exs. YY, ZZ.  The Receiver charged the estate $1,864 in fees for the two months. In January and February, 2005, the Receiver received $1,880 and $2,206, respectively, in rents.  *See* States *Exs. AAA, AAA2*. The Receiver's fee for January through February 18, 2005, was $2,883.51.  See States Exs. NN, OO, and OO2. The Receiver received 15% of the gross collected and charged the Properties an hourly rate of $100 an hour.  *See* March 7 Tr. at 71.  The City of Auburn contends that the Debtor owes $29,313.69 in back taxes on the Properties.[4] *See*

---

[4] $6,362.29 owed on 3 Perrine Street; $2,895.27 owed on 13 Wall Street; $2,313.55 owed on 58 Chapman Avenue (the Court presumes this refers to 56 Chapman Avenue); $5,058.31 owed on 6 Washington Street; $4,609.74 owed on 71 Seymour Street; $8,074.53 owed on 73 Seymour Street.

11

Hussey Aff. at 1.


# ARGUMENTS


The Debtor contends that if given control of the Properties, it would immediately cure any Housing Code violations and reopen all the units for rental.  Heffernan testified that the Debtor would hire an independent contractor to perform the repairs, if that became necessary.  *See* April 4th Tr. at 35.  To do this, Heffernan testified that the Debtor would use the cash from its general operating account or from the sale of its motor vehicles.  *Id.*  Heffernan testified that the Debtor possesses motor vehicles that it can readily sell.  *Id.*  The balance in the Debtor's checking account for the period of February 1, 2005 through April 2, 2005 was $38,165.39, which came from the Debtor's auto sales and apartment rental business.  *See* April 4 Tr. at 26;  Debtor Ex. 25. The Debtor notes it earned a net income of $9,061 in auto sales for the month of February. The Debtor also alleges that it received $11,462 for January 2005 and $11,304 for February 2005, in gross rent receipts from the Debtor's seventeen other income producing real properties, which are not encumbered by mortgages.  *See* April 4 Tr. at 32; Debtor Ex. 23 . The Debtor asserts that these figures show that it has the financial capability to repair and manage the apartments.

In order to have a successful reorganization, the Debtor argues that it is imperative that the Court give the Debtor immediate control over the Properties in order to make repairs and to manage the Properties unfettered by the actions or omissions of the Receiver. The Debtor estimates that if the Properties were turned over, the estate would receive between $9,500 and $10,500 per month in additional income.  *Id.* at 37.  The Debtor also contends that the Receiver's

administration of the Properties has been disastrous.  The Debtor argues that the dramatic decrease in rent collected and the abysmal condition of the Properties is evidence that the Receiver did not manage them in a competent manner.

States opposes the Debtor's motion to use cash collateral and remove the Receiver on the grounds that there is no cash from rents available and that the Receiver is serving an essential function in preserving the Properties' status quo.  States maintains that the Receiver has carried out his fiduciary duty as a court-appointed agent to treat the Properties with the same level of care and concern as he would his own property.  The Receiver noted in the evidentiary hearing that the Debtor failed to turn over leases, failed to account for and turn over security deposits, and failed to place them in interest bearing accounts.  The Receiver's record is admirable under the circumstances, according to States.  States also argues that the Properties are not necessary for the Debtor's plan of reorganization because they are not self-sufficient and they have absorbed a great deal of monetary investments during the time the Receiver managed the Properties.  *See* March 7th Tr.  at 5-6.

States also seeks relief from the automatic stay to complete the foreclosure of the Properties that began pre-petition.  States argues that there is no equity in the Properties, there is no positive cash flow from them, they  are not necessary for reorganization and that the best way to preserve as much of the Properties as possible is to permit it to complete the foreclosure sale.

States argues that the Debtor has failed to present any evidence of a plan, let alone one that is feasible and capable of adequately protecting States's interest.  States asserts that it is the Debtor's burden to prove that the Properties are essential to its plan of reorganization.  Heffernan

13

testified that the Debtor's apartment rental business accounts for about 70% of its revenue.  *See* April 4th Tr. at 8.  Six of the twenty-five properties are secured by a single, consolidated mortgage held by States.  *See* March 7th Tr. at 9.  States claims that the rent roll for these six Properties as of November 5, 2003 was $2,900.  Using this number of $2,900, States asserts that the potential rents will, even if collected and paid directly to States as adequate protection each month, barely cover the per diem interest on States's obligation, let alone contribute to any reorganization plan.  At best, States claims, the $38,000 the Debtor had in its bank account in April would only cover the $30,000 expense of making the repairs Heffernan testified would be necessary to make before he could rent the units.

## DISCUSSION

States initially asserts that the *Rooker-Feldman* doctrine prevents the Court from exercising the necessary jurisdiction to remove the Receiver.  The *Rooker-Feldman* doctrine is confined to cases brought by unsuccessful state court litigants who complain of injuries caused by a state court judgment and seek federal court review and rejection of those judgments. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 125 S.Ct. 1517, 1521-22 (2005).  The *Rooker-Feldman* doctrine occupies a "narrow ground" and "does not otherwise override or supplant preclusion doctrine..." *Id*. at 1522.  It does not prevent a bankruptcy court from removing a state court appointed receiver because in Code § 543 Congress has provided bankruptcy courts with jurisdiction to supervise and remove such receivers.  Moreover, under the former Bankruptcy Act, the Supreme Court noted that "[T]he jurisdiction of the bankruptcy court being paramount,

14

the power of the state court to fix the compensation of its receivers and the fees of their counsel necessarily came to an end with the supervening bankruptcy. When the bankruptcy court acquired jurisdiction, the sole power to fix such compensation and fees passed to that court." *Gross v. Irving Trust Co.*, 289 U.S. 342, 345 (1933). *See also In re 400 Madison Ave. LP*, 213 B.R. 888, 897 (Bankr. S.D.N.Y. 1997) (providing that under the former Bankruptcy Act, the Supreme Court firmly established that it was the bankruptcy court, and not the state court which had appointed the receiver, that was to supervise the receiver and fix fees). Under Code § 543, the state court's jurisdiction over its appointed receiver terminates once the debtor files a petition for bankruptcy relief. Nothing remains for the pre-petition receiver to do except comply with Code § 543. *In re Rimsat*, 193 B.R. 499, 502 (Bankr. N.D. Ind. 1996).

Code § 543(b) provides that:

> A custodian shall (1) deliver to the trustee any property of the debtor transferred to such custodian, or proceeds of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and (2) file an accounting of any property of the debtor, or proceeds of such property that, at any time, came into the possession, custody, or control of such custodian.

A state court appointed receiver is a "custodian" within the meaning of Code § 101(11). *In re Lizeric Realty Corp.*, 188 B.R. 499, 506 (Bankr. S.D.N.Y. 1995). Therefore, once a bankruptcy petition is filed, a non-bankruptcy custodian's receivership terminates and the custodian must, as a general proposition, deliver the debtor's property to the trustee or the debtor, and must account for the properties which were in the custodian's possession, custody, or control as a custodian. *See In re WPAS, Inc.*, 6 B.R. 40, 43 (Bankr. M.D. Fla. 1980).

While turnover is the general rule, Code § 543(d) provides an exception to this

requirement. Code § 543(d) provides that:

> (d) After notice and hearing, the bankruptcy court--
> (1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property, and
> (2) shall excuse compliance with subsections (a) and (b)(1) of this section if the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, unless compliance with such subsections is necessary to prevent fraud or injustice.

Although the Receiver took possession of the Properties more than 120 days before the petition filing date, Code § 543(d)(2) does not apply to the facts before the Court because the Receiver was not an "assignee for the benefit of the Debtor's creditors." *In re Sundance Corp.*, 83 B.R. 746, 748 (Bankr. D. Mont. 1988) (providing that case law indicates that a state court receiver generally is not an "assignee for the benefit of the debtor's creditors"). An assignee for the benefit of creditors is one to whom a debtor voluntarily assigns its property to be administered for the benefit of its creditors. *Id.*  Under Code § 101(11), the definition of a custodian explicitly includes both a receiver and an assignee for the benefit of creditors. *See Id.* at 749. *See also In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328 331 (Bankr. S.D. Ohio 1990). Congress would not differentiate between a receiver and an assignee for the benefit of creditors if they were one and the same. Here, the Receiver appointed by the New York Supreme Court was not appointed at the Debtor's request or with its consent.  Thus, the Receiver is not an assignee for the benefit of the creditors under the Code.

Code § 543(d)(1), however, gives this Court the power to excuse the Receiver from turning over the Properties if it is in the best interest of the creditors. Courts assess the creditors'

interests by examining several factors, which have evolved to include: (1) whether there will be sufficient income to fund a successful reorganization; (2) whether the debtor will use the property for the benefit of the creditors; (3) whether there were instances of mismanagement by the debtor; and (4) whether there are preferences which a receiver is not empowered to avoid (because a receiver does not possess avoiding powers for the benefit of the estate). *See Dill v. The Dime Saving Bank* (*In re Dill*) , 163 B.R. 221, 225 (E.D.N.Y. 1994); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 103-04 (Bankr. S.D.N.Y. 1991); *In re Northgate*, 117 B.R. at 332; *In re Powers Aero Marine Servs., Inc.*, 42 B.R. 540 (Bankr. S.D. Tex. 1984). The Debtor's interests are not part of the criteria a Court considers in applying  Code § 543(d)(1). *The Dime Saving Bank*, 163 B.R. at 225. Conversely, under Code § 543(d)(1), a "mere showing that the creditors will feel more comfortable with certain assets (such as cash or its equivalent) controlled by a third party rather than the debtor is usually not sufficient. Creditors are usually not comfortable with the debtor in charge of any assets." *In re KCC-Fund V, Ltd.*, 96 B.R. 237, 240 (Bankr. W.D. Mo. 1989).

Upon examining the factors, the Court finds that it is too early in the case to determine whether the Debtor can successfully reorganize, particularly given the Debtor's inability to access six of the properties. Currently, the Properties do not produce a positive income stream to assist in a reorganization, and States has provided its own funds to maintain the insurance. The Properties appear to be capable of producing sufficient income, if they are repaired and then successfully rented, which the Debtor states is its intention. There are, however, instances of the Debtor's mismanagement of the Properties. For example, the Debtor did not have the Properties insured. The importance of insurance was shown when a fire burned down one of the Properties

which the Receiver had insured upon taking control of them. The Debtor also failed to pay taxes on the Properties. Additionally, at the time the Receiver took control of the Properties, several rental units were unoccupied, five tenants needed to be evicted and there were a number of Housing Code violations pending with the City of Auburn. *See* States Ex. E.

The fourth factor in the analysis is not an issue here because neither party has raised the prospect of any avoidance actions at this point.

Generally, the equities favor a debtor or debtor in possession because a significant impediment is added to the debtor's burden of attempting to reorganize and to promulgate an acceptable plan of reorganization if the debtor does not have access to all of its income producing assets during its initial breathing spell. *See In re KCC-Fund*, 96 B.R. at 239-40. Furthermore, turnover is the general rule. *In re Poplar Springs Apartments of Atlanta, Ltd.*, 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989).  The Court does not believe that the creditor's  interests are better served by having the Receiver continue to minimally manage the Properties. The evidence presented at the evidentiary hearing shows that tenant occupancy rates of the Properties are decreasing.  The Properties now have four tenants.  The rents received are not enough to maintain the Properties and to repair the condemned apartments. Each month the Receiver collects substantial fees for managing the Properties.  In the context of the Debtor's effort to reorganize, there is no point in having the Receiver continue to possess them. The apartment units are floundering, and money and time needs to be spent on repairing them. The Debtor will have an incentive to rehabilitate the apartment units, which the Receiver lacks, because the Debtor's financial future hangs in the balance. Thus, the Court believes that the Debtor should be given a final chance to recover them and make them profitable. This chance, however, will be a

controlled one because the Court is concerned about the Debtor's ability to manage the Properties, given their past history of mismanagement.

Furthermore, the Debtor did not meet its burden of proof under Code § 362(d)(2). States requested relief from the automatic stay pursuant to Code § 362(d)(2). Code § 362(a) provides that a bankruptcy petition "operates as a stay, applicable to all entities," of the enforcement, against the Debtor, of the state court judgment that gave States the power to sell the Properties in a foreclosure sale. However, subsection 362(d)(2) provides that on request of a party in interest and after notice and a hearing, the court shall grant relief from the stay ...

> (2) with respect to a stay of an act against property under subsection (a) of this section,
>
> if--
>
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization...

The burden of proof on a Code § 362(d)(2) motion to lift or modify the automatic stay is a shifting one. *Sonnax Indus., Inc. v. Tri Component Prods. Corp.* (*In re Sonnax Indus., Inc.*), 907 F.2d 1280, 1285 (2d Cir. 1990). Code § 362(g)(1) places the burden of proof on States to establish the amount, if any, of the Debtor's equity in the Properties. The burden then shifts to the Debtor on all other issues. *Code § 362(g)(2).* At the March 7, 2005, evidentiary hearing both the Debtor and States stipulated that the total amount of States's secured claim was $286,948.32 under the Note and Mortgage, plus attorney fees and costs of $20,149.50 and disbursements of $7,553.28. The total amount owed was $314,651.10. The total value of the Properties, according to Schedule B of the Debtor's bankruptcy petition, is $200,100. Without having to calculate the amount of taxes owed on the Properties, it is clear that the Debtor has no equity in them. The

burden, thus, shifted to the Debtor to prove that the Properties are necessary for an effective reorganization. The Debtor, however, never attempted to directly provide any proof of an ability to reorganize other than its reference to the cost of rehabilitating the Properties and the potential income they would generate. Therefore, the Court will conditionally grant States relief from the automatic stay. Code § 362(d) permits a court to place conditions on this relief granting it broad discretion in the formulation of appropriate terms of relief from the automatic stay in individual cases by providing that the court may terminate, annul, modify, or condition the stay on an appropriate evidentiary showing. *Kemper Ins. Co. v. Profile Sys., Inc.* (*In re Profile Sys., Inc.*), 193 B.R. 507, 511 (Bankr. D. Minn. 1996). *See, e.g.*, *Hallet v. Commerce Bank of Barry County*, (*In re Billick*), 67 B.R. 670, 672 (Bankr. W.D. Mo. 1986) (previous court order granted relief from automatic stay unless debtor made sufficient offer of adequate protection within fifteen days).

The Court will, thus, allow the Debtor to regain possession of and manage the Properties and grants the Debtor's motion to use cash collateral upon the following conditions:

1. The Debtor must complete the monthly operating report form approved by the U.S. Trustee, and file said report with the U. S. Trustee for this District, the Court and States by the fifteenth of the month following the month for which the report is complete;.

2. The Debtor must attach to the operating reports a single document showing the income, expenses, and net rent for each apartment. The document must also provide the total income, total expenses, and total net rent for all the apartments contained on the Properties. If an apartment is vacant or condemned, the

document must provide that information;

3. The Debtor must maintain adequate fire and liability insurance on the Properties naming States as mortgagee and provide proof of the continuing insurance coverage with each operating report;

4. The Debtor must cooperate with the U.S. Trustee and must respond to any inquiries made by the U.S. Trustee within forty-eight hours of receipt the request;

5. The Debtor must establish and provide proof of one separate, segregated account for the deposit of security deposits belonging to the tenants of the Properties;

6. The Debtor must provide States adequate protection in return for the use of States's cash collateral. The adequate protection is the following:

(i) The Debtor will acknowledge in writing that States has a first mortgage lien on the Properties, as well as a first priority security interest in all cash proceeds generated by said Properties;

(ii) The Debtor will deposit all cash proceeds from the Properties, including rents and insurance proceeds, in a separate account maintained at a mutually acceptable bank, other than States and will fully account for all such cash proceeds to States on a monthly basis by providing States a copy of the bank statement promptly after its receipt by the Debtor;

(iii) The Debtor will agree that States's liens on the Properties and States's claims to the Properties' cash proceeds will remain superior and prior in right to any hereafter created lien on or security interest in the Properties or the cash collateral;

(iv) The Debtor must provide to States on a monthly basis an itemized list of expenses

incurred in the operation of the Properties that are paid from the cash collateral.

7. States shall provide a carve-out from its cash collateral for the fees of the Debtor's professionals as hereafter approved by the Court, as well as the fees owed to the United States Trustee pursuant to 28 U.S.C. § 1930.

If any of the foregoing conditions are not met at any time, and States provides the Debtor and the Debtor's counsel with a notice of default specifying the nature of the default, and the default is not cured within ten days of receipt of the notice, States shall have the right to seek an ex parte order granting immediate relief from the automatic stay pursuant to Code § 362(d) in order to proceed to foreclose its liens.[5]

The Court further orders the Receiver to turn over the Properties to the Debtor within twenty (20) days of the date of this order and to file an accounting of the income and expenses of each of the six properties during the period of his receivership in accordance with Code § 543(b)(2), said accounting to be filed within sixty (60) days of the date of this order.

IT IS SO ORDERED.

Dated at Utica, New York

this 26th day of October 2005

/s/ Stephen D.  Gerling
STEPHEN D.  GERLING
Chief U.S. Bankruptcy Judge

---

[5] The Court has not ordered the Debtor to make a monthly adequate protection payment to States because the record is devoid of any competent proof of what amount that payment might properly be.  The Court, however, does not preclude either party from making a subsequent application to the Court to fix such payments, if warranted.